UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 13-20063-CR-GRAHAM

UNITED STATES OF AMERICA,

vs.

LAWRENCE FOSTER and
JOHANA LEON,

　　　　Defendants.
_____/

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Lawrence Foster's Objections to the Pre-sentence Investigation Report ("PSI") and Motion for a Downward Variance [D.E. 462], the government's sentencing memorandum [D.E. 443], and responses to Defendant Foster's objection to the pre-sentence report [D.E. 466 and 469].

**THE COURT** has considered the motions, pertinent portions of the record, testimony proffered during the evidentiary hearings held on April 28, 2015, and July 7, 2015, including the testimony of co-defendant Jordan McCarty, and is otherwise fully advised in the premises. For the reasons set forth below, the Court finds that Defendant Lawrence Foster is not entitled to a credit against loss amount under United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1 n.3 (E)(i)and (ii). Moreover, the financial loss attributable

1

to Defendant Foster's crime under U.S.S.G. § 2B1.1(b)(1) is $8,305,433.71.

## I. BACKGROUND

### A. Paradise Is Mine Scheme

Paradise is Mine ("PIM") was a company located in Miami Beach, Florida, purportedly offering investment opportunities in a residential real estate development project located in Rum Cay, Bahamas. Defendant Lawrence Foster ("Foster") was the President of PIM. To induce investors to invest in PIM, Defendant Foster distributed and caused others to distribute promotional materials, including sales brochures and email containing purported news articles featuring stories about PIM's development of a residential community in Rum Cay, Bahamas. Investors receiving this information believed that PIM's Rum Cay development was a successful venture and that numerous celebrities "purchased" land. Investors believed the PIM "articles" were "featured" in the reputable news sources identified under their respective logos. Investors were not told that the purported articles, which appeared on the PIM web page and in sales brochures, were press releases created by PIM. Moreover, during the existence of PIM, at least from December 2009 through January 31, 2013, Defendant Foster directly, or indirectly, solicited funds from investors.

Investors were offered two opportunities to invest in PIM. The first opportunity allowed investors to invest in marketing,

2

promotional, and business initiatives related to the development of Rum Cay by making loans to PIM, which were collateralized by options to the lots. Secondly, investors could buy options in real estate lots located in Rum Cay.

Through PIM's misrepresentations, the company collected approximately $8.3 million from investors. PIM paid out approximately $280,000.00 in partial payments to investors. Less than 3% of the funds collected were distributed as interest payments to investors. At the time of Defendant Foster's arrest, the Federal Bureau of Investigation ("FBI") seized the $1.1 million remaing in PIM's bank accounts.

### B. Procedural Background

On October 2, 2013, a jury returned a unanimous verdict finding Defendant Foster guilty of conspiracy to commit wire fraud and six counts of wire fraud. Immediately following the verdict, it was discovered that extrinsic evidence, which was specifically excluded during trial, was presented to the jury for consideration during the deliberation stage of the trial. This error occurred despite the Court giving the following instructions to counsel at the conclusion of trial:

> Please review these items before they are actually given to the court security officer to take to the members of the jury. I want the attorneys to confer on the exhibits that have actually been received in evidence. Make sure you review the documents carefully and we don't send anything back to the jurors that has not been received in

evidence. This is very important. If you have any dispute as to whether an item was received, I ask you to first check with the court reporter, who maintains records. If you cannot resolve it, let me know. I too kept a log and we'll resolve the issues.

[Trial Tr. 10-1-2013, p. 1185]. Notwithstanding the October 2, 2013 verdict, on March 31, 2014, the Court granted Defendant Foster's motion for a new trial as a result of, at the very least, the negligence of the attorneys in allowing excluded extrinsic evidence into the province of the jury. [D.E. 272].

Following a second trial, on October 22, 2014, the jury once again returned a unanimous verdict finding Defendant Foster guilty of conspiracy to commit wire fraud, in violation of 18 U.S.C. §1349 and six counts of wire fraud in violation of 18 U.S.C. §1343. Defendant Foster now stands before the Court for sentencing.

In his motion, Mr. Foster objects to the $8,025,110.51 loss amount in paragraph 21 of the PSI; the 20- level increase to his offense level at paragraph 26 of the PSI; the offense level of 33 reflected at paragraphs 31, 33 and 68 of the PSI and the guideline imprisonment range of 135 to 168 months at paragraph 68 of the PSI. [D.E. 462].

Defendant Foster asserts there were approximately 14 investors who paid approximately $1.8 million for parcels of land in Rum Cay, Bahamas. Defendant Foster contends that under 2B1.1 n.3 (E)(i), he should be given credit for the current market value of the Rum Cay lots against the loss amount of $1.8 million suffered by the

victims that purchased lots because the purchasers' ownership interests in the properties remain intact. [D.E. 462, Ex B]. Additionally, Defendant Foster asserts there were approximately 73 individuals who loaned PIM approximately $6 million secured with interest in Rum Cay lots. Defendant Foster now contends that because the lenders' interest in the collateral pledged to secure their respective loans remains intact, the value of the lots which collateralized the lenders' loans should be credited against the loss amount pursuant to §2B1.1, n. (E)(ii). [D.E. 462, Ex B].

The government contends that under Guideline 2B1.1(b)(1), the Court should hold Defendant Foster criminally responsible for the full amount of money that he received from his victims. Additionally, this Court should not reduce the Defendant's advisory Guidelines because Defendant Foster cannot meet his burden of showing that the victims received anything of value. [D.E. 443]. Further, the government asserts that because any documents, including those transferring purported interest in collateral, provided by Defendant Foster were designed to conceal and further his fraud scheme, they should not be the basis of reduction or a credit under § 2B1.1, n. (E)(i) or (E)(ii). <u>Id.</u>

## II. Legal Standards

"A district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." <u>United States v. Campbell</u>, 765 F.3d 1291, 1298 (11th Cir. 2014)(internal

citation omitted). Section 2B1.1(b)(1) of the Guidelines provides for a series of enhancements based on the amount of loss attributable to a defendant's fraud. The Guidelines Commentary defines loss as "the greater of actual loss or intended loss," with "actual loss" being "the reasonably foreseeable pecuniary loss that resulted from the offense" and "intended loss" being "the pecuniary harm that was intended to result from the offense" even if "impossible or unlikely to occur." U.S.S.G. § 2B1.1, comment. (n.2(A)(i) and (ii)). See, generally, United States v. Willis, 560 F.3d 1246, 1250 (11th Cir.2009) (per curiam); United States v. Nosrati-Shamloo, 255 F.3d 1290, 1291-92 (11th Cir.2001) (per curiam).

If the defendant returned any money to the victim or rendered any legitimate services to the victim before the fraud was detected, the loss amount must be reduced by the fair market value of the returned money or the services rendered. U.S.S.G. § 2B1.1 cmt. n.3(E)(i). This "credit" accounts for the fact that "value may be rendered even amid fraudulent conduct." United States v. Campbell, 765 F.3d 1291, 1302 (11th Cir. 2014)(internal citations omitted). However, a fraudster may not receive credit for value that is provided to his victims for the sole purpose of enabling him to conceal or perpetuate his scheme. Id.

While the Guidelines provide some general principles to guide the calculation of the loss amount, "the appropriate method for

estimating loss in any given case is highly fact-dependent." Campbell at 1301-02. Accordingly, the Court is entitled to considerable leeway in choosing how to go about this task. Id. As explained by the Eleventh Circuit Court of Appeals, "[f]raud is conjured in numerous variations and that should be considered when choosing a calculation methodology for the harm intended or caused." United States v. Gupta, 463 F.3d 1182, 1199 (11th Cir. 2006).

Being in the unique position to assess the evidence and estimate the loss based upon the evidence, in determining the loss embraced by the offense conduct, the Court only need make a reasonable estimate of the loss amount. U.S.S.G. § 2B1.1 cmt. n.3(C); Campbell, 765 F.3d 1291, 1301-02 (11th Cir. 2014); United States v. Bradley, 644 F.3d 1213, 1290 (11th Cir. 2011) (citation and internal quotation marks omitted). A reasonable estimate of the loss amount is appropriate because "often the amount of loss caused by fraud is difficult to determine accurately." United States v. Miller, 188 F.3d 1312, 1317 (11th Cir.1999). However, in whatever methodology it chooses, the court must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines. United States v. Willis, 560 F.3d 1246, 1251 (11th Cir. 2009). Rather, the amount of loss must be proven by a preponderance of the evidence, and the burden must be satisfied with "reliable and specific evidence." Campbell at 1301-02; United

States v. Medina, 485 F.3d 1291, 1304 (11th Cir. 2007).

Moreover, under the Sentencing Guidelines' approach to economic crime, the amount of financial loss attributable to a defendant's crime serves as a proxy for "the seriousness of the offense and the defendant's relative culpability." U.S.S.G. § 2B1.1 cmt. background. "If, in the sentencing court's assessment, that calculation under- or overestimates the seriousness of the offense (e.g., in cases where the crime caused substantial nonmonetary harm or created the risk of much greater financial losses), then the court may grant an upward or downward departure as needed." United States v. Campbell, 765 F.3d 1291, 1301 (11th Cir. 2014); See id. cmt. n.20.

### III. FACTUAL FINDINGS

In light of the oral and documentary testimony received at the evidentiary hearings, the Court makes the following factual findings by a preponderance of the evidence. Defendant Foster, through Paradise is Mine ("PIM"), intentionally defrauded investors who either loaned money to the company, or who intended to buy land in Rum Cay Bahamas directly from PIM. PIM collected approximately $8,305,433.71 from investors. PIM paid out $280,323.20 in partial payments to investors. At the time of Defendant Foster's arrest, $1.1 million remained in PIM's bank accounts.

Investors who loaned money to PIM received documents

purporting to pledge lots in Rum Cay, Bahamas as collateral securing the loans made to PIM. Likewise, investors who purchased land options received documents purporting to convey an option to lots in Rum Cay. All investors were advised that in order to obtain title to the lots in Rum Cay they would have to pay an additional 10% tax to the Bahamian government.

PIM advised investors that they could pay the stamp tax and receive absolute title to the land. Alternatively, the investors could sell the option and allow the buyer of the option to pay the stamp tax. Upon payment of the stamp tax, absolute title to the land would transfer to that person. None of the investors who engaged in the land option investment vehicle received the final document of conveyance because they were hopeful they could sell their option and make a profit. Payment of the 10% stamp tax would have required paying additional funds to the Bahamian government, which in some instance would have been equivalent to approximately $35,000.00. Because the goal of the investment was to make money, investors wanted to avoid diminishing their total return by paying the stamp tax. Likewise, no investor with collateral interest in Rum Cay land has paid the stamp tax requirement and received title. There is no evidence that any investor exercised the option to land, sold the option to land, paid the government stamp tax, or received absolute title to any lot in Rum Cay.

**IV. DISCUSSION**

Determining the loss amount in fraud cases can be quite complicated. Here, the jury determined beyond a reasonable doubt that Defendant Foster engaged in fraud. In fact, two juries reached the same conclusion. The Court must now determine the financial loss attributable to Defendant Foster's crime and whether Defendant Foster is entitled to a credit against the loss amount under U.S.S.G. §2B1.1 n.3 (E)(i)and (ii).

### A. Loss Amount

As a general rule, in determining the loss amount, Application Note 3(A) of §2B1.1 provides that the loss is the greater of actual loss or intended loss. Here, the intended loss is approximately $8,305,433.71, the full amount of money that Defendant Foster received from his victims. The actual loss is $8,025,110.51, the amount received from the victims ($8,305,433.71) minus interest payments ($280,323.20) paid to those investors who made loans prior to the discovery of the fraud.

As noted by the Fifth Circuit in <u>United States v. Deavours</u>, 219 F.3d 400, 403 (5th Cir. 2000),

> the amount of the intended loss, for purposes of sentencing, is the amount that the defendant placed at risk by misappropriating money or other property. That amount measures the gravity of his crime; that he may have hoped or even expected a miracle that would deliver his intended victim from harm is both impossible to verify and peripheral to the danger that the crime poses to the community.

<u>Id.</u> (internal citations omitted).

Here, Defendant Foster placed the full amount of money received from investors at risk. Other than the nominal interest payment of less than 3% of the funds received by PIM from investors ($280,323.20), the victims received nothing of value in exchange for their investment. As further addressed below, the victim's purported interest in Rum Cay land, and the true market value of same is speculative. The full amount of money Defendant Foster received from his victims properly represents the gravity and extent of the fraud, as well as his relative culpability. Moreover, while some victims received interest payments before the fraud was detected, these payments were provided to victims for the sole purpose of enabling PIM to conceal or perpetuate the fraud. PIM "returned" no money to the victims and Defendant Foster is not entitled to a reduction in the amount of the interest payments. For these reasons, the Court finds that the greater intended loss amount of 8,305,443.71 is the appropriate loss amount for purposes of the advisory Guidelines range. [1]

### B. Credit against Loss

Defendant Foster argues that the value of the Rum Cay lots received by the purchasers of the land option contracts should be credited against the loss amount pursuant to U.S.S.G. § 2B1.1 n.3 (E)(i). Also, the value of the lots which collateralized the lender's loans should be credited against the loss amount pursuant

---

[1] The Court notes that there is no difference in the guideline calculation for a loss of either $8,305,443.71 or

11

to U.S.S.G. §2B1.1 n.3 (E)(ii).

In reading Application Note 3(E) in its entirety the Court, in determining market value, considers the purpose of the credit for collateral. Section 2B1.1, n. (E)(i) and (ii) concerns *Credits Against Loss* that are to be applied in the calculation of Loss Amount for Guidelines purposes and states, in pertinent part:

Loss shall be reduced by the following:

(i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.

(ii) In a case involving collateral pledged or otherwise provided by the defendant, the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing.

See U.S.S.G. § 2B1.1, n.(E). Under U.S.S.G. § 2B1.1, n.(E), a credit is allowed for and contemplates assets that are in existence with the likelihood or probability that the value of the credit is something the victim could recover before the offense was detected. Note 3(E)(i) contemplates something of finite or existent value capable of being of value to a victim. With regards to collateral pledged, Note 3(E)(ii) considers the amount the victim has recovered from the disposition of the collateral, which in this case the parties agree is zero, or if the collateral has not been

---

$8,025,110.51.

12

disposed, the fair market value of the collateral which a victim can collect, which in this case is likewise zero.

The Court has carefully considered the facts related to the fraudulent scheme and given the parties an inordinate amount of time to brief and argue their respective positions. With respect to determining the current market value of the purported collateral, the Rum Cay lots, the Court reviewed several appraisal reports and considered the testimony of defense and government expert witnesses. The appraised value of the Rum Cay lots at issue varied greatly, as did the testimony of the expert witnesses. In fact, the appraised values range from approximately $1.6 million to approximately $28 million. Given such a variance, the Court cannot fairly and by a preponderance determine any collateral value.

In deciding the issues, the inability to reach a finding of collateral value is of no consequence. Even if the Court could determine the market value of the collateral by a preponderance of the evidence, Defendant Foster is not entitled to a reduction based on same. The jury determined that the scheme in this case was fraudulent. The nature of the scheme must be considered in determining the method used to calculate the harm caused or intended. <u>United States v. Newton</u>, 559 Fed. Appx. 902, 914 (11th Cir. 2014). Here, in order to perpetrate the fraud, PIM either sold options to, or pledged as collateral, interest in Rum Cay lots. The fraudulent scheme was furthered by the documents

conveying interest in the land that Defendant Foster now attempts to use as a basis for a credit. But a fraudster may not receive credit for value that is provided to his victims for the sole purpose of enabling him to conceal or perpetuate the scheme. Campbell at 1302. Specifically, Defendant Foster provided option agreements for the purchase of land, and documents purporting to show collateral in Rum Cay land to ensnare victims. Because the documents that Defendant Foster provided to the victims were needed to perpetuate and continue the fraud, they should not be the basis of a reduction.

Also, in determining that no credit is warranted, the Court finds U.S. v. Orton, 73 F.3d 331 (11th Cir. 1996) instructive. Although Orton involved a Ponzi scheme case, it shares similarities to the case at bar. As in Orton, to create the illusion of a successful investment program, PIM paid a few investors approximately $280,000 in interest payments. Although investors received interest payments, it does not appear that the loans were secured by obtainable collateral, as represented by PIM. In fact, under the scheme, obtaining interest in any potential collateral required investors to expend even more money by paying the 10% stamp tax. There was nothing of value securing the loans that did not require even more investment. In order to obtain the collateral purportedly securing the loans, investors in essence were required to throw good money after bad, thus incurring additional loss.

Even more telling is PIM's method of compensation to its sales force. As explained by co-defendant McCarty, fifty (50%) percent of the purchase price and/or the monies loaned by victims to PIM were paid as commission to the salesforce. The remaining fifty (50%) percent was distributed to Defendant Foster and/or his associates as compensation. Again, up until the arrest of Defendant Foster in January 2013, there is no evidence that any investor funds were used towards the development of the Rum Cay land as represented to investors. This commission and compensation scheme also has a substantial impact on the true value of the land and the Court's inability to fairly and by a preponderance determine any reasonable collateral value.

In Orton, the court recognized the "loss to losing victims" method which focuses on the actual harm to the victims. Here, loans were made by victims to PIM. While some investors received interest payments, we see from the bank accounts, millions of dollars being withdrawn with little, less than 3% going to victims. In fact, funds loaned by victims of the fraudulent scheme seemingly disappeared into thin air as a result of substantial withdrawals by PIM. Of the approximately $8 million deposited into the account, it appears that no funds were used to improve or develop the subject property at Rum Cay, yet only $1 million remained in the account at the time the FBI closed the operation with the arrest of Defendant Foster. As such, one consideration in the Court's denial of a

15

credit against the loss amount is the "loss to losing victims" method. The Court understands that this is not exclusively a Ponzi scheme case but it certainly has similar elements and characteristics.

The collateral credit concept accounts for the fact that value may be rendered even amid fraudulent conduct. Further, it recognizes that the offender who actually transfers something of value is committing a less serious offense because the loss is less than what it could be. Here, no value was rendered or transferred to the victims, other than interest payments. Moreover, Defendant Foster has not shown by a preponderance of evidence that any victim can or will receive anything of value in the future. The inherent complication of the stamp tax requirement and the additional outlay of money by investors in the hopes of recouping previous losses precludes Defendant Foster's entitlement to the credit. The PIM scheme subjects investors to additional risk in order to attempt any type of collection on the collateral. This is contrary to the spirit of the credit against loss.

In measuring the loss within the factual circumstances presented and from the perspective of the victims, and in the context of sentencing, the Court finds that investors received nothing of value. United States v. Machado, 333 F.3d 1225, 1228 (11th Cir. 2003). Moreover, investors would not have purchased land options or loaned PIM money at all in the absence of the fraud. In

16

light of the jury's determination that the entire PIM scheme was a fraud, and there being no transfer of title to Rum Cay land to a victim or anyone else, investor's purported interest in the Rum Cay land is essentially worthless. Newton at 914.

In considering all the facts in this case, the deduction of collateral does not provide the most fair loss assessment. This case and its fraudulent scheme are exceptional and off-setting the loss amount with the value of the collateral pursuant to 3E (i) or (ii) would not capture the full scope of the fraud. The Court does not find by a preponderance of the evidence that there is the likelihood or probability that the value of the credit is something the victims could recover. Accordingly, the Court does not find Defendant Foster is entitled to a credit against this loss amount.

### V.   BURDEN OF PROOF

It is the defendant's burden to prove that he is entitled to a reduction in his advisory Guidelines range for benefits conferred to his victims. The burden of proof as to the entitlement to a sentence reduction rests with the defendant. United States v. Cruz, 946 F.2d 122, 126 (11th Cir. 1991). Conversely, the government has the burden of proving the applicability of a guideline section which would enhance the offense level. United States v. Shriver, 967 F.2d 572, 575 (11th Cir. 1992). The burden of proof is on the party seeking to adjust the offense level to establish by a preponderance of the evidence why the adjustment is merited. United

States v. Charlesworth, 217 F.3d 1155, 1158 (9th Cir. 2000).

Defendant Foster spent considerable efforts showing the value of Rum Cay parcels. It is not enough to merely show a purported or illusory value in principal. Defendant Foster must show added value to the victims. The true value of collateral is the likely and probable receipt of value by the victims. Of the over $8 million dollars received from PIM victims, other than interest paid on loans in the amount of $280,323 prior to the discovery of the scheme, victims have not received one penny of collateral or title to anything of value. Defendant Foster asserts that investors' interest in the Rum Cay land has value because the options are properly recorded with the Bahamian Registry of Records and all that is required is payment of the stamp tax to receive title. However, there is no evidence that any investor exercised the option to land, sold the option to land, paid the government stamp tax, or received absolute title. Rather, it is appears Defendant Foster's representation as to investors ability to obtain title is a continuation of the fraudulent scheme. Other than the documents assigning lots to purchasers, or as collateral to lenders, used by PIM to perpetrate the fraudulent scheme, there is no showing of benefits conferred to the victims. Moreover, Defendant Foster has not shown, by a preponderance of the evidence, that victims are likely to receive anything of value, including title to Rum Cay land. To the contrary, the preponderance of the

evidence is that the recovery of the purported collateral is clearly problematic at best. Defendant Foster's speculative showing of purported value in Rum Cay lots does not satisfy his burden of proof as to the victim's probable receipt of anything of value or his entitlement to a credit.

### VI. CONCLUSION

After considering all of the memoranda, testimony and arguments, the Court finds that Defendant Lawrence Foster is not entitled to a credit against loss amount under U.S.S.G § 2B1.1 n.3 (E)(i) and (ii). Moreover, the financial loss attributable to Defendant Foster's crime under U.S.S.G. § 2B1.1(b)(1) is $8,305,433.71. Defendant Foster's objections to the PSI are overruled.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 1st day of September, 2015.

DONALD L. GRAHAM
UNITED STATES DISTRICT JUDGE

cc: All Counsel of Record